PIERCE O'DONNELL (SBN 081298)
PODonnell@GreenbergGlusker.com
PRIYA SOPORI (SBN 210837)
PSopori@GreenbergGlusker.com
JAMES R. MOLEN (SBN 260269)
JMolen@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone: 310.553.3610
Fax: 310.553.0687

Attorneys for Plaintiff
ESSEX CAPITAL CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESSEX CAPITAL CORPORATION, a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> VIVEK GARIPALLI, an individual; SEQUOIA HEALTHCARE SERVICES, LLC, a New Jersey limited liability corporation; WINTHROP "WIN" HAYES, an individual; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 2:17-cv-04055-BRO-SK <br><br> Assigned To: The Hon. Beverly Reid O'Connell <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **1) FRAUD** <br><br> **2) CONCEALMENT;** <br><br> **3) FALSE PROMISE;** <br><br> **4) BREACH OF CONTRACT; AND** <br><br> **5) PROMISSORY ESTOPPEL** |

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**NATURE OF THE CASE**

1.     This case involves massive Medicaid fraud, gross mismanagement and diversion of corporate funds, and outright criminal conduct by Defendant Vivek Garipalli and his cohorts.

2.     The victim of this colossal scam was Plaintiff Essex Capital Corporation ("Essex" or "Plaintiff") which provided $10 million of medical equipment financing to Allcare, a company controlled by Garipalli, based on materially false financial statements prepared by Garipalli.

3.     But for the fraudulent financial statements—overstating income by $5.5 million and understating debts and fixed obligations—Essex would not have suffered the staggering losses in the case.

4.     This scam did not end there. Garipalli diverted $2.35 million of a new $10 million credit facility from MidCap to his company Sequoia Healthcare Services in violation of Allcare's loan covenants with MidCap and agreements with Essex. The unavailability of this vitally-needed operating capital further crippled the ailing Allcare and made it even more problematic for Allcare to stave off bankruptcy.

5.     Garipalli kept falsely reassuring Essex that Allcare had the revenue necessary to make timely and complete lease payments to Essex. At the same time that these rosy financial statements were being made, MidCap had significantly reduced Allcare's line of credit due to Allcare's pathetic performance—another material fact not divulged to Essex.

6.     Starved for operating capital, devoid of revenues, and managed by criminal con artists, Allcare filed bankruptcy on December 31, 2014. Essex's claims against Defendants are not affected by the bankruptcy.

7.     Defendants' tortious conduct cost Essex at least $10 million. This is a classic "teach them a lesson case" where hefty punitive damages are required to punish Garipalli and his cronies and deter other smooth-talking hustlers from

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  bilking honest businessmen.

2  **PARTIES**

3      8.      Plaintiff is a California corporation in good standing that leases

4  equipment to businesses and maintains its principal place of business in the County

5  of Santa Barbara.

6      9.      Vivek Garipalli ("Garipalli") is an individual and the principal investor

7  in and chief executive officer of Sequoia Healthcare LLC, which was the majority

8  owner of Passaic Healthcare Services, LLC.  Garipalli is currently the CEO of

9  Clover Health Care Services in San Francisco, California.

10     10.     Sequoia Healthcare Services, LLC ("Sequoia") is a limited liability

11  company formed in New Jersey.

12     11.     Winthrop "Win" Hayes ("Hayes," collectively with Garipalli and

13  Sequoia, "Defendants") is an individual and the President of Passaic Healthcare

14  Services, LLC d/b/a Allcare Medical.

15     12.     The true names and capacities, whether individual, corporate, associate

16  or otherwise, of the defendants named herein as Does 1 through 50, inclusive, are

17  unknown to plaintiff at the present time who therefore sues such defendants by such

18  fictitious names.  Plaintiff will amend this complaint to show the true names and

19  capacities of the Doe defendants when they have been ascertained.  Plaintiff is

20  informed and believes, and based thereon alleges, that Does 1 through 50, inclusive,

21  were responsible in some manner for the acts and transactions hereinafter alleged

22  and are liable to Plaintiff therefor.

23     13.     In doing the acts alleged herein, each of the defendants was the agent,

24  principal, employee, co-conspirator and/or alter ego of one or more of the other

25  defendants, and acted with one or more of the other defendants' knowledge,

26  consent and approval and/or within the course and scope of such agency,

27  employment or conspiracy and/or as one or more of the other defendants' alter ego.

28  As such, each of the defendants is responsible for the liabilities of the other

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

defendants, as alleged herein.

## JURISDICTION AND VENUE

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2). As outlined herein, a substantial portion of the events and omissions that give rise to Plaintiffs' claims, including Defendants' conspiracy and many of the fraudulent communications outlined herein, occurred and were centered within the Central District of California.  No other district has as substantial a relationship to these events and omissions as the Central District of California.

15.     Likewise, this Court has personal jurisdiction over each of the defendants.  As outlined herein, in furtherance of their conspiracy and fraudulent scheme, Defendants directed fraudulent communications, including emails and phone calls to California, physically met with Plaintiff's representatives in California, received money transferred from Plaintiff's California bank accounts, and caused injuries to Plaintiff in California.  Defendants also caused Plaintiff to enter numerous equipment leases as part of their conspiracy and fraudulent scheme, all of which were signed and negotiated by Plaintiff in California, and each of which contains a mandatory California forum-selection and choice of law provision.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

16.     Ralph Iannelli ("Iannelli"), a California resident and Plaintiff's chief executive officer, met Hayes through Twinlab Holdings, Inc., when Hayes was employed there as the Vice President of Finance and Mergers and Acquisitions. Thereafter, Iannelli and Hayes developed an episodic friendship.

17.     Hayes subsequently became the President of Passaic Healthcare Services, LLC d/b/a Allcare Medical ("Allcare") a New Jersey-based durable medical equipment (DME) company.  Allcare was largely owned by defendant Sequoia and its principal, defendant Garipalli.  Through Garipalli, Sequoia funded

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Allcare's operations by making significant advances, thereby making defendant

2  Sequoia a major creditor of Allcare—in addition to being its parent company and

3  controlling shareholder.

4       18.    In the spring of 2011, Hayes, acting on behalf of Allcare, approached

5  Essex to obtain equipment financing for Allcare, whereby Essex provided fresh

6  capital to Allcare by purchasing equipment from Allcare and leasing that same

7  equipment back to Allcare under the terms of a 36-month lease that was negotiated

8  and signed by Essex in California.  Essex was provided with a bill of sale that

9  purported to give Essex full right, title, and interest to the equipment.

10       19.    The first equipment leases between Essex and Allcare were signed on

11  June 23, 2011.  The relationship quickly expanded.  By the end of 2014, Allcare

12  had gone from leasing $350,000 worth of equipment from Essex to leasing

13  approximately $10,000,000 worth of equipment from Essex.  Each and every one of

14  the underlying equipment leases was negotiated and signed by Essex at the

15  company's principal place of business in Santa Barbara, California.

16       20.    For its first two leases with Essex, Allcare timely paid the rent in full.

17  Throughout 2013, Defendants met with Iannelli in person and communicated with

18  Iannelli and other Essex representatives by phone and by email.  In these meetings

19  and communications, Defendants represented to Iannelli that the business was on

20  track and that as a result of hiring away the sales team from competitor Landauer

21  Metropolitan ("Landauer"), Allcare would have $125,000,000 to $150,000,000 in

22  projected revenue.  Defendants knowingly directed the majority of these

23  communications to Iannelli and other Essex representatives in California, the

24  location of Essex's principal place of business.

25       21.    Defendants represented to Iannelli and others that hiring employees

26  away from Landauer—and specifically its sales team—would generate multi-

27  millions of dollars in new business opportunities for Allcare.  In reality, Allcare's

28  acquisition of Landauer's personnel was not the result of a well-thought out

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

business plan, but rather the result of Garipalli's personal grudge against the CEO of Clairvest—a venture capital company and majority investor in Landauer. Because Allcare was overly leveraged and Garipalli was unwilling to fund Allcare as promised, Allcare lacked the infrastructure and working capital to take advantage of the additional sales that could have resulted from bringing additional sales teams onboard.

22.     Unbeknownst to Plaintiff, in early June 2013, John Accumanno—former Director of Finance for the competing company whose employees Allcare acquired—warned Allcare management that changes in Medicare's reimbursement policy would seriously reduce the company's cash flow, and that Allcare could expect a reduction in receivables of approximately 35%.  In December 2013, Accumanno prepared an analysis showing that Allcare's total debt in December 2012 was $16,378,745.  Six months later, by June 2013, it had increased to over $18.6 million.

23.     In order to maintain the sham that Allcare was in the black and to induce Essex to enter into additional sale and leaseback agreements, Defendants provided Essex with financial statements that Essex would later learn were falsified.  These false statements, knowingly delivered to Essex's representatives in California, did not match Allcare's internally distributed financial statements.  The copies provided to Essex overstated Allcare's income by approximately $5.5 million.  The fraudulent financial documents showed that Allcare's revenues were ramping up and demonstrating a high growth rate.  In reality, what was ramping up were Allcare's debts and fixed obligations.

24.     Unaware of the true state of Allcare's finances, Essex continued to purchase more medical equipment from Allcare and then lease it back to Allcare. By February 17, 2014, Essex and its affiliate Cornerstone Essex collectively entered into 11 leases with Allcare, totaling several million dollars.  Each of these leases was negotiated and signed by Essex at the company's principal place of business in

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Santa Barbara, California.   Essex, as part of its ordinary dealings with Cornerstone

2  Essex, indemnified Cornerstone Essex for any losses in these transactions.

3     25.   In October 2013, under the pretext of Allcare's having "outgrown" its

4  current credit facility, Garipalli sought a larger $10,000,000 credit facility from

5  MidCap Financial Services, LLC ("MidCap"), a middle market-focused, specialty

6  finance firm that provides senior debt  to companies across many industries.

7  Defendants represented to Iannelli that Allcare could secure funding only under

8  certain conditions.  One such condition was that Allcare would use all of the money

9  loaned by MidCap for the ongoing operations of Allcare and not use any of the

10  credit facility to pay creditors or investors.  Another condition reported to Iannelli

11  was that Essex would have to promise to forbear in the exercise of certain rights

12  under the equipment leases for one year.  Specifically, it would not be permitted to

13  use valuable collection rights it was otherwise guaranteed under its leases with

14  Allcare.

15     26.   In furtherance of Defendants' fraudulent scheme and to induce Essex's

16  to forbear, in or around October 2013, Garipalli executed a letter agreement on

17  behalf of Sequoia which promised Essex that Sequoia would not forclose on certain

18  equipment leased by Essex to Allcare.  Garipalli, on behalf of Sequoia, delivered

19  this letter agreement to Ianelli at Essex's principal place of business in Santa

20  Barbara, California.

21     27.   After coercing Essex's agreement to forbear on October 15, 2013,

22  unbeknownst to Essex and before the ink had dried on the MidCap agreement,

23  Garipalli claimed $2,350,000 of the MidCap funds to repay debts owed to his

24  affiliate, Sequoia.  As a result of this demand, which Garipalli had represented was

25  barred by the MidCap facility, Defendants caused Allcare to pay $2,350,000 to

26  Sequoia.  These funds were directly wired by MidCap to Sequoia and were not

27  available for the Allcare business plan.

28     28.   In or around January 2014, Iannelli and Garipalli met at a JP Morgan

1   Healthcare Conference in San Francisco.  At that time, Garipalli again reassured
2   Iannelli that Allcare was in good financial condition and committed to continue to
3   fund the company.

4        29.   In April 2014—just two months after Essex had entered into its final
5   lease with Allcare—Hayes attended a meeting with Iannelli and Todd Coffin, a debt
6   broker from Source Capital.  In the midst of Hayes' reassurances that Allcare had
7   the revenue necessary to make its lease payments to Essex, Hayes took a call from
8   MidCap.  Iannelli later learned that the purpose of MidCap's call was to inform
9   Hayes that MidCap was significantly reducing the advance on Allcare's line of
10   credit as a result of Allcare's anemic collections.

11        30.   Despite the undisclosed reduction of their credit source, throughout the
12   remainder of April 2014, Defendants continued to communicate, via emails and
13   phone calls directed to California, a sunny forecast of Allcare's financial state to
14   Essex.  In meetings with Allcare executives, however, Hayes admitted that plaintiff
15   was "screwed."

16        31.   Once Iannelli learned that MidCap had cut Allcare's funding and
17   confronted Hayes with that fact, Hayes simply lied that MidCap's actions were the
18   result of a "glitch in the system" and reassured Iannelli that there was "no problem
19   with the receivables."  When Iannelli questioned Garipalli about Allcare's anemic
20   collections, Garipalli continued to assure Iannelli that he was going to personally
21   make good on the lease payments if necessary to keep Allcare afloat if Essex
22   refrained from declaring a default, which would have a devastating impact on
23   Allcare's business.  At the time, Iannelli was still unaware that Garipalli's company
24   Sequoia had been directly paid by funds from the MidCap credit line.  Defendants
25   continuously repeated these misrepresentations, in substance and effect, by phone
26   calls and emails that Defendants knowingly directed to Essex in California.

27        32.   In or about June 2014, Hayes finally confessed to Iannelli that MidCap
28   significantly reduced the line of credit because the "receivables aren't there."

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Though Allcare was making only intermittent payments on the leases, Hayes still continued to reassure Iannelli that Allcare needed "roughly 90 days to make everyone whole." Hayes importuned Iannelli to refrain from sending a default letter that, in Hayes' view, would make it harder to obtain the capital from other sources to make everyone whole. Iannelli agreed.

33. Throughout the summer of 2014, Garipalli refused to put in the necessary funds to keep Allcare in business. Instead, he laid off approximately 100 of the employees that he had hired away from Landauer.

34. In August 2014, Hayes informed Iannelli that Allcare was filing for bankruptcy and could not make any lease payments to Essex. Instead of filing for bankruptcy, however, Allcare sought additional investors. Hayes approached one creditor with the proposal that it purchase Allcare for $42,000,000 in order to save itself from a $10,000,000 loss.

35. Though Garipalli is currently described on the website of his new company Clover Health Care Services as a "serial healthcare entrepreneur and turnaround expert," he ironically, refused to fund Allcare's portion of its employees' health insurance plan, which was provided by one of Garipalli's other health care companies—CarePoint, the predecessor company to Clover Health. As a result, the employees of Allcare were left with unaffordable, astronomical bills for medical care that was necessary for themselves and their families.

36. At the end of 2014, Iannelli sent a default letter to Garipalli and received no response to his letter or to his text messages. On December 31, 2014, Passaic/Allcare filed its petition for bankruptcy.

## FIRST CAUSE OF ACTION

(Fraud Against All Defendants)

37. Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 36, above.

38. In or about June 2013, Defendants represented to Iannelli that Allcare

1   would have $150 million in revenue.  Defendants, acting in concert, presented

2   Iannelli with false financial documents.  These false financial documents were

3   delivered by Defendants via email to Essex in California, the location of its

4   principal place of business.  Defendants further represented that Allcare was "on

5   track" and represented that Allcare would in fact be able to collect its receivables.

6       39.     In or around January 2014, Iannelli and Garipalli met at a health

7   conference in San Francisco.  At that time, Garipalli reassured Iannelli that Allcare

8   was in good financial condition and that he was committed to continuing to fund

9   the company.

10      40.     In fact, Defendants' representations were false.  Allcare did not have

11  $150 million of projected revenues.  In fact, of the receivables it did have, a

12  substantial portion was improperly and illegally submitted to the United States

13  government for reimbursement.

14      41.     Defendants knew these representations were false when made.  The

15  financial books and records of Allcare showed a substantially lesser amount.  Even

16  that amount was inflated, because Defendants knew that a substantial portion did

17  not qualify for reimbursement under the federal Medicare program and that Allcare

18  would never collect the amounts represented to plaintiff as "receivable."

19      42.     Defendants intended that Plaintiff would rely on the representations by

20  extending millions of dollars in equipment lease financing to Allcare.

21      43.     Plaintiff did in fact rely on Defendants' representations and extended

22  millions of dollars in equipment lease in reliance thereon.  The funding provided by

23  Plaintiff came solely from banks based in California.  Plaintiff's reliance on

24  Defendants' misrepresentations was reasonable because of Iannelli's friendship

25  with Hayes, the President of Allcare, and because of the financial records and

26  documents presented by Defendants that purported to back up Garipalli's

27  representations.

28      44.     As a direct and proximate result of Defendants' misrepresentations,

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Plaintiff leased additional millions of dollars in equipment to Allcare, of which more than $5.5 million were never recouped because of Allcare's poor financial condition that resulted in bankruptcy. The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

45.     Plaintiff is also entitled to recover punitive and exemplary damages because of defendants' fraud and deceit. Defendants acted with malice, in that they intended by their conduct to cause injury, and in that the conduct was carried on with a willful and conscious disregard of plaintiff's rights.

## SECOND CAUSE OF ACTION

### (Concealment Against All Defendants)

46.     Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 45, above.

47.     When Defendants made representations regarding Allcare's financial position, largely by emails and phone calls directed to Plaintiff in California, they intentionally concealed important facts that made the disclosure deceptive. Specifically, they failed to disclose that a substantial portion of the receivables would be for charges to be submitted to the United States government under the Medicare program and that a large percentage of the receivables were for goods and services that Defendants in fact knew the Medicare program would not reimburse.

48.     Likewise, Defendants knew that Allcare would use money from the MidCap financing to repay Sequoia but concealed that fact from Plaintiff when asking Plaintiff to enter into a forbearance agreement in connection with the MidCap financing. Plaintiff negotiated this forbearance and executed the related documents in California and the majority of Defendants' communications with Plaintiff regarding this forbearance agreement were by phone calls and emails directed to Plaintiff in California.

49.     Plaintiff did not know of the concealed facts.

50.     Defendants intended to deceive Plaintiff by concealing the facts

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   regarding Allcare's financial condition and the MidCap financing in order to induce

2   Plaintiff to lease equipment to Allcare and to refrain from enforcing Plaintiff's

3   rights under the leases.

4   　　　51.　　Plaintiff reasonably relied on Defendants' deception because of the

5   friendship between Iannelli and Garipalli, because of Defendants' familiarity with

6   the intricacies of Medicare rules and regulations, and because of Defendants'

7   familiarity with the negotiations for the MidCap financing.

8   　　　52.　　As a direct and proximate result of the misrepresentations made by

9   Defendants, Plaintiff leased equipment worth millions of dollars to Allcare, of

10   which more than $5.5 million was never recouped because of Allcare's poor

11   financial condition that resulted in bankruptcy.  The amount of Plaintiff's damages

12   will be proved at trial but is believed to be in excess of $7.8 million.

13   　　　53.　　Plaintiff is also entitled to recover punitive and exemplary damages

14   because of Defendants' fraud and deceit.  Defendants acted with malice, in that they

15   intended by their conduct to cause injury, and in that the conduct was carried on

16   with a willful and conscious disregard of plaintiff's rights.

17   　　　　　　　　　**THIRD CAUSE OF ACTION**

18   　　　　　　　　(Promissory Fraud Against All Defendants)

19   　　　54.　　Plaintiff re-alleges and incorporates herein by reference each and every

20   allegation set forth in Paragraphs 1 through 53, above.

21   　　　55.　　In or about October 2013, Defendants, acting in concert, represented to

22   Iannelli that Allcare had "outgrown" its existing credit facility and needed an

23   additional $10 million in financing from a third party, MidCap Financial.

24   Defendants stated that as a condition for Allcare's securing additional funding,

25   Plaintiff must promise not to foreclose on its security interests.  Defendants

26   promised that Allcare would invest the entire $10 million from MidCap into Allcare

27   and that none of it would be used to repay debtors or investors.  The majority of

28   Defendants' communications with Plaintiff in this regard were by phone calls and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    emails directed to Plaintiff in California.

2         56.    Defendants' promises were false.  At the time of these promises to

3    Iannelli, Defendants never intended for Allcare to use the money as represented.

4    Within days of receipt of the investment of MidCap's money, and in furtherance of

5    their conspiracy, Defendants caused $2.35 million of that sum to be diverted to pay

6    to Sequoia in advance of all other creditors of Allcare, including Plaintiff.

7         57.    As a direct and proximate result of the misrepresentations made by

8    Defendants, Plaintiff did not repossess its equipment or enforce its rights under the

9    equipment leases at a time when it would have recovered substantial amounts of its

10   losses on the lease agreements.  The amount of Plaintiff's damages will be proved

11   at trial, but is believed to be in excess of $7.8 million.

12        58.    Plaintiff is also entitled to recover punitive and exemplary damages

13   because of Defendants' fraud and deceit.  Defendants acted with malice, in that they

14   intended by their conduct to cause injury, and in that the conduct was carried on

15   with a willful and conscious disregard of Plaintiff's rights.

16                        **FOURTH CAUSE OF ACTION**

17            (Breach of Contract Against Defendant Vivek Garipalli)

18        59.    Plaintiff re-alleges and incorporates herein by reference each and every

19   allegation set forth in Paragraphs 1 through 58, above.

20        60.    In or around April, 2014, in response to Iannelli's inquiries about

21   Allcare's collections, Garipalli assured Iannelli that, if Essex would refrain from

22   declaring a default and under the defaulted leases, Garipalli was going to personally

23   contribute the funds necessary—including payment of the leases—in order to keep

24   the business operating, thus creating a clear, valid and enforceable contract.

25        61.    Plaintiff accepted this offer by forbearing in declaring a default or

26   under the equipment leases. The forbearance constituted full performance of

27   Plaintiff's obligations.  Plaintiff negotiated this forbearance and executed the

28   related documents in California.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

62.     Garipalli, on the other hand, breached the promise as he continually refused to put in the necessary funds to keep Allcare in business, instead laying off approximately 100 of the employees.  Garipalli never put in the promised funds, and Allcare eventually filed for bankruptcy.

63.     As a direct result of Garipalli's promise to put in the promised funds to keep Allcare afloat, Plaintiff did not declare a default or exercise its rights under the equipment leases at a time when it would have recovered substantial amounts of its losses on the lease agreements.  The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

## FIFTH CAUSE OF ACTION

(Promissory Estoppel Against Defendant Vivek Garipalli)

64.     Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 63, above.

65.     In or around April 2014, in response to Iannelli's inquiries about Allcare's collections, Garipalli clearly and unambiguously promised Iannelli that he was going to personally contribute the funds to pay off Allcare's operational expenses, including its leases with Essex, which were necessary to keep the business from going under.

66.     As a direct result of, and in reliance on, Garipalli's promise to put in the necessary funds to keep Allcare afloat, Plaintiff did not declare a default, sue Allcare, or otherwise enforce its rights under the equipment leases at a time when it would have recovered substantial amounts of its losses on the lease agreements.

67.     Plaintiff's reliance on Garipalli's promise was both reasonable and foreseeable, as Garipalli made the promise directly in response to Plaintiff's concerns over Allcare's collections, and in order that Plaintiff not immediately repossess the equipment or take other remedial action.

68.     The amount of Plaintiff's damages will be proved at trial, but is believed to be in excess of $7.8 million.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Essex Capital Corporation prays for judgment in its favor and against defendants Vivek Garipalli, Sequoia Healthcare Services, LLC, and Win Hayes on the first through fifth causes of action as follows:

1.     For compensatory damages, both general and specific, according to proof;

2.     For punitive damages in an amount sufficient to punish defendants and deter defendants and others from engaging in similar conduct;

3.     For attorneys' fees and costs of suit; and

4.     For such other and further relief as the Court may deem proper.

DATED:  June 28, 2017

GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP

By: _/s/ Pierce O'Donnell_
        PIERCE O'DONNELL (SBN 081298)
        Attorneys for Plaintiff
        ESSEX CAPITAL CORPORATION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590